Thank you, Your Honor. May it please the Court, John Duggan on behalf of Valerie Hawkins and Janice Patterson. At the outset, I think it's clear and can be shown easily from the case decisions that anybody, any person who becomes primarily, unconditionally, and absolutely liable on a credit transaction is an applicant under the ECOA. But in this case, my clients are unconditionally, absolutely, and primarily liable for the debt according to the bank's allegations. How do you interpret or what do you think of the logic and rationale in the Moran case from the Seventh Circuit, which takes a different perspective? Well, I think what occurred in the Seventh Circuit was actually a different set of facts than what we have here, and it wasn't elucidated. In that case, Your Honor, the Seventh Circuit articulated that the guarantors were not applicants because they didn't apply for anything. The record on appeal before this Court and the arguments from the bank's counsel are that the reason why a guarantor is not an applicant is because they have a secondary liability on the debt. Only if the borrower cannot pay would the guarantor be required to pay, which is not the facts here. In this case, the guarantees are unconditional, absolute, primary liabilities. It's no different in this case than if my clients would have signed the note with PHC Development and their husbands, another common manner in which banks structure financing on transactions. They don't use guarantees. They use co-borrowers to sign the note. I'm sorry, Judge. That gets very intricate then. You're saying some guarantors may be applicants and other guarantors may not be applicants, whether it's primary or secondary? No, Judge, I'm not. I'm saying that when you start to peel back the layers of the complexities of the financial transactions and the manner in which banks can actually structure them, this statute clearly gives the regulators the authority directly, exclusively, to interpret the statute and regulate with the force of law. Under Chevron, the court looks at that. In fact, you echoed the opinions of Chevron and me in a couple of decisions that you wrote, Judge Collison, in Hess and in Beeler. And in Hess and in Beeler, you echoed the rationale that if there's a specific grant of authority to a regulator, to pass regulations with the force of law, that we will give deference to the regulators unless the regulation is arbitrary, capricious. If the statute is ambiguous. Correct. But in the analysis in both Hess and Beeler, as well as in Chevron, the actual court didn't come to the conclusion and never said the statute was ambiguous. In fact, in Chevron, the Supreme Court said we are convinced, as the Court of Appeals is, that the Congress never intended for these bubble zones to be part of the initial Clean Air Act. However, because Congress granted express authority to the regulators to pass regulations with the force of law, the regulation, in our view, furthers the purposes of the statute, the Clean Air Act, and therefore we're going to grant Chevron deference because we can't substitute our legislative interpretation or view of what is reasonable for the regulators if it's not arbitrary or capricious. In my view, this statute, the ECOA, has never answered the question when a guarantor is in the exact same position as a co-borrower on a note, i.e., their liability is absolute, unconditional, and primary. Does the record in this case show that the applicants would have qualified for the loan without the guarantors? We believe it does clearly, Judge, but we never got to the merits of the case because the very narrow issue presented to the district court was a pure legal issue of standing because they were nominated a guarantor under a document called a guarantee. Did they have standing to bring the cause of action? And the district court relied on the Moran rationale and said, we don't think a guarantor is an applicant without going through the Chevron analysis that Judge Colleton went through and Hess and Beeler saying, well, wait a minute, this is a bit of a different circumstance because we actually have a regulator that's been granted an express authority to regulate with the authority of law and to interpret the statute. And under those conditions, even if the statute doesn't specifically address the question here, we grant deference. And in my view, in this case, that statute does not address the question. If I have a guarantor that is specifically, unconditionally, primarily liable for the debt, as the bank claims in this case, the bank can sue Valerie Hawkins and Janice Patterson without suing their husband, without suing the borrower, or without going after the collateral, and they can collect the full amount of the debt. The regulators, in effort to further the purposes of the statute, say, we're going to define persons who become or are contractually liable to repay a debt as an applicant because it makes sense because there is an infinite number of ways that banks can structure these financial transactions. And my clients, in this case, are in no different position than if they had signed the note as a co-borrower. In fact, the court in Bolduc v. Beal Bank, the First Circuit case, 167 Fed 3rd 667, those were the exact facts. The wife was a co-borrower, and the court said, we think they're standing as an applicant. In this case, to suggest that if my clients had actually signed the note so that the bank could sue them directly for the liability here, and that because my client signed a document that's called an unlimited commercial guarantee, which says the exact same thing, the bank can sue my clients, whether they sue the borrower or go after the collateral, their liability is unconditional and unlimited, is to elevate form over substance. We have the same transaction. Did the records show if the guarantors had any interest in the business? The clear evidence, Your Honor, is that Valerie Hawkins did not. There is a factual dispute as to whether or not Janice Patterson did, and that factual dispute was never briefed on summary judgment and never presented to the trial court. On appeal, we think the bank's trying to move for summary judgment for the first time in their response brief, and they suggested that, in fact, Janice Patterson was somehow interested in the business because Chris Patterson, as trustee of a trust where Janice Patterson was a beneficiary, was the owner. But if you look at the actual trust documents, and they're not all supplied to the court. Only half the trust document was part of the appendix. But if you look at Article IV of the trust, at the appendix, page 808, 809, it very specifically says, each trustmaker shall also have the absolute right to remove his or her own separate property, in whole or in part, from the trust at any time. Chris Patterson, in the underlying state court litigation and in his deposition, made it very clear that that ownership in this PHC development was his and his alone, that even though he put it into the trust, the express provisions of the trust would permit him to pull it out any time he wants. So that's the factual dispute that there is in the trial record, but it's never been resolved on summary judgment, Your Honor. So with regard to Valerie Hawkins, clearly no interest. With regard to Janice Patterson, a factual dispute. We believe the bank has no right to tell us what our trust document was intended to do, and we think that will be a subject for summary judgment on remand, I think, in our favor. Let me get back to what I think are some really critical points. The bank, in its pleadings, in this case, as part of us being an applicant, says, in the counterclaim that they filed, this is Appendix 972, Paragraph 133, Appendix 962, Paragraph 114, the bank said unequivocally, we would not have entered into this credit transaction unless Janice Patterson and Valerie Hawkins were unconditionally, absolutely, and primarily liable. What page did you say? That's page 972, Paragraph 133, page 962, Paragraph 114. The bank sent out demand letters, and they attached those demand letters to their counterclaim. That's at Appendix 892 and 896. In the demand letters the bank sent to Valerie Hawkins and Janice Patterson, they said you're unconditionally and primarily liable for the debt. We don't have to sue the borrower or anybody else to collect the debt in full from you. The bank's very allegations in this case make it crystal clear that the bank says we entered into the credit transaction because the spouses were unconditionally and primarily liable. There's no difference between the spouses signing the note as a co-borrower or signing a guarantee that says we can sue you without suing anybody else. It's the same legal premise. What's your response to the argument, and I think the district court even cited it, that your theory here is turning the purpose of the ECOA on its head? In other words, the discrimination against married women was designed so that they wouldn't be turned down because they couldn't get their husband to co-sign. Your theory seems to turn that upside down. Let me just be as straight as I can. It's really not my theory. I'm simply following the regulations that were passed by the regulators, and the regulators have said applicants have standing, guarantors are applicants. Applicants can bring a cause of action for punitive damages, for emotional distress, for declaratory relief, and for attorney's fees. But isn't the fundamental purpose a remedy for the denial of credit? Precisely, and here's where I get back to you. I think we can't substitute our judgment for the regulators. They believe, and I believe this to be the case. Who is denied credit in this case? Valerie Hawkins, who now is straddled with a lawsuit where she's being sued for $2.1 million, who was nothing but a housewife at the time she signed the guarantee. That's not being denied credit. She's not being denied credit, but she probably will be denied credit in the future because she's now a defendant in a lawsuit, and if she were to go seek credit for her own independent purposes in the future, I believe that, in fact, she will be denied credit because she won't be able to get it with a lawsuit pending against her for $2.1 million. And I believe, at the end of the day, that when the Congress granted this authority, and keep in mind they did a significant amendment to the ECOA in 2010, three years after the Moran decision came down. I redlined it. There are a number of changes throughout the ECOA, the statute itself, by Congress in 2010. They never changed the definition of applicant in 2010 to reflect the concerns that were raised by Moran. In fact, what they did is they made a fairly extensive modification to Section 1691B, which is the promulgation of regulations by the Bureau, and they added specific sections under Sections F and G, and under those sections, which I redlined in my copy, they made it very clear that they wanted the Board to be able to pass regulations with the authority of law, and in Subsection G, they said we want the courts to grant the regulators the most deference that can be granted as a regulator interpreting the statute. The response to Moran by Congress wasn't to go back and change the definition of applicant that Moran raised a concern on. Has the Supreme Court ever said that if Congress amends a statute or doesn't respond to an agency regulation that's contrary to the statute, that it implicitly endorses the regulation? I don't know if the Supreme Court has. The Eighth Circuit has said that. I put it in my brief. I don't have that on the top of my head, Judge. I'll see if I can find it for my response. Well, if it's in the brief, I'll refresh my memory. Yeah, one of the things that was said in those cases was that the length of time from the passage of the regulation and inaction by Congress speaks loudly to the fact that the regulators have the interpretation correct. In this case, Congress spoke 25 years after the regulation and after the concerns were raised in Moran, and Congress never changed the definition of applicant and never said the regulators had it wrong. In fact, they passed a law that said the regulators' regulation should have the force of law and they should be given deference. I'd like to reserve the remaining time for my rebuttal. Thank you so much. Thank you, Counsel. Mr. Lang? Sorry. I'm sorry. That's okay. Please excuse me. It's an often. Ms. Lang. If it pleases the Court, Greer Lang, appearing on behalf of Community Bank of Raymoor, the appellee. First, Your Honors, I'd like to address this issue about Mr. Duggan's principal argument all relates to and derives from the regulations. He ignores the statute. The law is clear, based on Chevron, that this court's obligation in determining whether or not a regulation is valid is the court has to start and stop if the language is plain and unambiguous in the statute. It has to start and stop with the statute itself. Here Congress defined who an applicant is. The argument that a guarantor and a maker of a note are the same, the guarantees at issue in all of these cases, there's no evidence in the record or nothing that Mr. Duggan has cited from the Moran case that indicates the guarantee that was at issue in that case is any different than the guarantee at issue in this case. Well, if I understand the appellant correctly, he's saying that the unique documents in this case created such liability and obligation on the part of the guarantors that they were functionally applicants because their liability wasn't secondary but primary. There's nothing unique about the guarantees that are at issue in this case, Your Honor. They're identical to commercial guarantees that are used by every bank in the country. They provide that in the event there's a default by the buyer or by the borrower, that once the bank is not then obligated upon default to go look to the borrower, in this case it wouldn't do any good. It was a limited liability company that had no assets. It can go directly to the borrowers and make demand for payment. It doesn't have to execute against the collateral. It's a standard guarantee that's used by most banks in the country. So it doesn't change the dynamic. In this case and under the statute, Congress said the applicant is the person who applies for credit, not the person who might be primarily or secondarily liable, but the person who goes out and applies for credit. Congress's purpose in enacting this statute was clear. It was to prevent discrimination against the applicant for credit. It didn't seek to protect the other parties that may come into the credit transaction, guarantors, pledgeors of collateral, a grantor under a deed of trust. Congress was very clear. The purpose of the statute was to protect, in the instance when the statute was enacted back in 1974, was to protect women who were unfairly discriminated against by borrowers in trying to obtain credit. Their income was discounted. Bankers had concerns about whether or not they would have children, and that would, you know, deplete their earning ability. That's not the situation in this case. Valerie Hawkins, Janice Patterson didn't apply for anything. They weren't denied anything. The borrowing entity here was a limited liability company, PHC Development, LLC. Under the statute. Well, your counterpart said the bank says it wouldn't have entered the loan agreement without the guarantees. Well. Did the applicant, the people you say were the PHC, did they have to furnish the guarantee together with the application before the loan was consummated? No, they didn't, Your Honor. And actually what the evidence is in the district court, based on the testimony of Mr. Hawkins himself, is when he went and asked the bank if it would consider making this loan, the bank said, who will you provide as guarantors? And Mr. Hawkins said, me and my wife and Mr. Patterson and his wife will be the guarantors. They offered their wives up. The bank didn't ask them. There's no evidence in the record in this case that Valerie Hawkins or Janice Patterson were ever, and the only thing the statute prohibits is requiring a guarantee. There's no evidence in the record that either of these women were ever required to provide a guarantee. And, in fact, if you look at the other ruling that Judge Whipple entered in this case, the ruling striking the wives' demand for a jury trial, Judge Whipple made the determination, and it's not been challenged on appeal, that the wives knowingly and voluntarily agreed to waive their rights to a jury trial when they signed their guarantees. Those same guarantees also provide representations that were made by the wives in this case that they were providing their guarantees at the request of the borrower, PHC Development, LLC, and not at the request of the bank. Not even at the request, let alone that the bank was requiring them. The Missouri law is quite clear. A person puts their signature on a document, and these two women put their signatures on 16 guarantees in this case. Over the course of 2005 through 2010, they signed 16 different guarantees and represented to the bank 16 separate times that they were providing their guarantees at the request of the borrower. Right, but I'm asking whether that could make them an applicant, because they are part of the group that is requesting that the bank provide the money, not whether the bank required them to do it, but whether they voluntarily joined in to the request for the loan by signing a guarantee that was going to be furnished to the bank. There's no evidence, Your Honor, that they made application for this loan. They came into the transaction after the transaction had already been essentially approved by the bank. They were not the ones going to the bank and asking for money. It was PHC Development that was doing that. The Moran case is quite clear on this point. The applicant is the borrower. It's not the people that come in secondarily on the transaction. And, yes, their liability might be primary, but their liability only kicks into place after there's been a default and there's been a demand by the bank. Did that answer your question, Your Honor? Thank you, yes. Okay. Well, I want to give it further thought, but I appreciate the response. Of course, of course. I want to go back to this notion, though, that these women each made affirmative representations to the bank that they were providing their guarantees at the request of the borrower and not at the bank. Now, Mr. Duggan has indicated that these alternate grounds that we have raised up in this case are not pertinent and should not be considered because they weren't raised in the district court. In fact, they weren't argued in the district court, but the standard of appeal is quite clear in this court. While the court can't convict the trial court of committing reversible error for an argument that it didn't have the opportunity to consider, this court does have the power to affirm the trial court on any ground that is supported by the record. Whether that argument was urged in the district court below or not, the factual statements that were presented on summary judgment set forth the execution of each of the 16 guarantees at issue in this case. Those factual statements were uncontroverted. Had Mr. Duggan wanted to controvert the validity of those signatures, they could have presented evidence to demonstrate why they contended that their signatures weren't valid or enforceable on those guarantees. They didn't. Their response to those factual statements was uncontroverted. Judge Whipland, in this case again, and again it's not an issue that is being appealed in this case, found that the wives voluntarily and knowingly signed their guarantees and agreed to the jury waivers that are contained in those. Those women cannot now come into court and try to refute the very representations that they made to the bank, which the bank relied on when it extended $2 million, $2 million that has been funded. They all received the benefit of this money, and they simply don't want to pay it back. The effect of what happens in this case, there are several cases that have indicated that the court can grant equitable or declaratory relief, and several of the courts that have considered this Reg B issue have gone on to say that that somehow implicitly gives courts authority to go in and void guarantees. There's nothing – if you were to go in and void the guarantees in this case, the bank will not be able to recover its money. There is no indication that what Congress intended was to punish banks. They set very small punitive damage rewards. They're not based on any willful or bad intent on the part of the bank. In this case, the maximum, if it were determined that there were a violation, would be $10,000. Congress didn't indicate, and the courts, in fact, have all uniformly found, there's no intent to invalidate the underlying obligation. If you invalidate the guarantees in this case, you render the bank unable to recover. So you're saying you wouldn't be able to recover against the actual makers of the note? The maker of the note is a limited liability company, Your Honor, with no assets, PHC Development Company. It was an entity that was formed for the purpose of doing this development. And so you're saying if it's invalid as to any guarantor, it's invalid as to all guarantors? If the wives' guarantees were invalidated, because Missouri, most properties held by the- They weren't the only guarantors, were they? They were not. Gary Hawkins is also a guarantor, as is Chris Patterson. So there are four guarantors. This wouldn't prevent you from seeking payment from the others, would it? Well, it wouldn't prevent us from seeking to recover from them, Your Honor. And, in fact, there's litigation pending on that. Would it prevent actual collection? Would it provide a windfall to the borrower? It probably would prevent ultimate collection because, in Missouri, most property is held as a property is tenancy by the entirety. So there would be an extremely difficult attempt, ability to recover on that. Here, when I want to try to step back and talk about the statute again, because there's nothing in the statute that says if you're primarily or if you're contractually or you may be contractually liable to pay, that we mean that's an applicant, too. Congress was very clear. Congress said the person who is the applicant, the person who we intend to protect, the person who we granted remedies to, the person who could go into court to seek remedies is the aggrieved applicant, and that's the person who applies for the credit. Had Congress wanted to include those other parties, it could have easily said so. And to suggest that by not going back in 2010 when the amendments were done, extending the statute of limitations and those kinds of things, I don't think that that answers the question. The case that Mr. Duggan had referred to as standing for the proposition that this regulation has some ambiguity in it is the case of Lee v. Yetter at 917F2-1104. In that case, the Eighth Circuit actually held the definitional term that was in the Agricultural Credit Act of 1987 was the term borrower. And the Eighth Circuit said unequivocally, Congress chose to define who a borrower is. That means you regulators can't step in and redefine that term for Congress. It doesn't mean that there might be something ultimately within the definition that the regulators couldn't come in and touch, but you can't redefine the term. Here, when the ECOA was enacted in 1974, the first regulations that came out were entirely consistent with what Congress had said. They didn't change until 12 years later in 1985. And to suggest that Congress has some person sitting aside who is watching every regulation that comes through the Federal Register and is watching every case that comes down from a court to see whether or not there's some court or a regulation that disagrees with what the statute says and that Congress actually has the time to go back and make all of those revisions is not realistic. It doesn't show that Congress's silence in the wake of what's been going on has any significance at all in this case. Congress defined borrower. What would Congress do to go back and tell the regulators, we meant what we said? Would they adopt a statute that said, hey, regulators, we meant what we said. We meant that a creditor or, excuse me, an applicant is the person who applies, not applies indirectly. Maybe you would include a guarantor in that group. We mean that the applicant is the person who applies directly for credit. The only entity in this case that applied for credit was PHC. There is not any allegation in this case that PHC was discriminated against by requiring, asking for, and in this case the wives at the request of the borrower provided their guarantees. There's no allegation of discrimination in that regard. Did your summary judgment motion include an alternative argument to the effect that there was insufficient evidence of discrimination? It did not, Your Honor. We did not have an opportunity to develop that. I would suggest, however, that the three or four additional alternative arguments that we've presented are clearly supported by the factual statements that were part of the summary judgment record. And I would, on that basis, regardless of what this court finds in that regard, would support affirming the trial court's award. Thank you. Thank you, Ms. Lane. Mr. Duggan. Thank you so much. With regard to the follow-up to Judge Grunder's comment, yes, in fact, there was an alternative grounds, and there is evidence in the record at Appendix 571, Paragraph 3, Appendix 574, Paragraph 3, Appendix 1423, that my client said the guarantees were acquired by the bank. The bank has suggested that in a boilerplate document, a statement that the guarantee was requested by PHC Development somehow bars the case. The fact that a borrower- It's just hard to imagine that there would be discrimination here where Missouri is a tenancy by the entirety of the state. It's very common to require guarantees from both spouses. Agreed. And there's nothing, Judge, that prohibits the bank from requesting a guarantee from a spouse as long as they make a determination that the other spouse or the borrower is not independently creditworthy. And if the case were to go back on the merits and the bank were to say, you know what, we looked at the financial statements- Being tenancy by the entirety. I mean, you know, if he's sitting on a $10 million bank account, all he's got to do is the next day add his wife's name to it, and then it's not collectible. But Gary Hawkins wasn't, and they knew that from his financial statements. He's a CPA, a principal at a CPA firm with a W-2 wage. If they're going to collect, they're going to collect on his W-2 wage. His wife had no income. She had nothing to recover from. She was not somebody that was going to add anything to the credit transaction. And that's why the regulation says don't automatically ask for the spouse's guarantee because it is discriminatory on the basis of marriage. The last point I want to make is Judge Colleton's opinion, I think, speaks volumes to what we're talking about because it's a financial regulation case. Hess v. Citibank. And there was an express delegation, and the judge said creditors need sure guidance through the likely technical truth in lending act. Congress gave the authority to the board. There needs to be uniform administrative decisions rather than piecemeal litigation. If you're to affirm what the district court did here, we give a judicial burial to the statute in the Eighth Circuit where a guarantor, even on an unconditionally primarily liable guarantee, cannot actually assert an affirmative defense, seek declaratory relief, or seek damages. Then we've got the Third Circuit and other circuits where we have piecemeal litigation substituting our view as lawyers for what the regulators say should be uniform. Thank you so much for your time. We simply ask that you reverse the district court and remand the case back for further proceedings. Thank you. Thank you, Mr. Duggan. The court wishes to thank both sides for your presence this morning, your participation in the argument. The briefing that you've submitted will take the case under advisement and render a decision in due course. Thank you.